The first case listed for oral argument this morning is Leon A. Kendall v. The Daily News Publishing Company, and Julie Blackburn, Ms. Green. We could have counsel for both sides come forward and be seated at counsel table, please. It's a great enough distance between here and the podium, we almost need binoculars to seek counsel, so please don't hide back there in the recesses of this new courtroom. All right, Ms. Green, if you would come forward, please. Thank you very much. Good morning, Your Honors. Good morning. I'm advised that these are very sensitive, so I hope that I'm not going to blast your ears. They are sensitive for all of us, so we're in a similar predicament. I'd like to reserve five minutes of my time for rebuttal, please. That's granted. May it please the Court, my name is Julie Green, and I represent the plaintiff appellant in this case, retired Judge Leon A. Kendall. Judge Kendall was a judge at the Superior Court of the Virgin Islands. Virtually from the outset of his term, the Virgin Islands Daily News launched a campaign of portraying him as being soft on crime, and specifically portraying him as a judge who released dangerous criminals on bail. Judge Kendall became a lightning rod for this campaign, in part because of a stand he took against a practice that was prevalent in the Virgin Islands at that time, of setting bail according to a standardized menu of offenses, rather than considering the particularized  And we, of course, having read the record, not to mention the briefs, are well acquainted with the specific alleged defamatory matter, three actual types that occurred here. But there are a number of very substantial issues here, and some that are unsettled as far as the Third Circuit is concerned. So if we could move directly from the facts to some of the legal issues here, Ms. Green, it would be appreciated, I'm sure, by the panel, and necessarily the facts enter into the defamatory matter that is alleged. An initial question that I have goes to the nature of independent review as we're required to apply it here. And you state in your brief that independent review requires us to defer to the historical facts which the jury found. Is that different from the standard deferential review of jury verdicts that this court would be called upon to apply? It is different. And in what respect? The basic difference is the method by which the court proceeds. First, the court needs to compile the facts that the jury necessarily found. What makes independent review different from the normal standard of review is that then the court goes on to examine those facts that the jury found, as it has compiled them, to determine for itself whether the finding of actual malice is supported. In other words, the court doesn't ask, could a jury on these facts reach this conclusion, but rather, do I, as the judge, believe that the conclusion is fairly reached? Is the best authority the major authority for us to be looking at Hart-Hanks? That's correct, Your Honor. And there are other cases following that. I think the Massachusetts Supreme Judicial Court of Murphy v. Herald does a nice job of laying that out. There is another very useful statement in Schiavone v. Time, a case that's in footnote 35. The court lays out how the actual malice evidence is analyzed, that the court needs to look at the, that defendants rarely admit to having. So should we be identifying what evidence or testimony the jury must have rejected? Is that what's called for here? The evidence that the jury must have found, I would put it that way, Your Honor. And in this case, I think there are two crucial pieces of evidence that the, there are two crucial errors committed by the Virgin Islands Supreme Court when it held that Judge Kendall failed to establish actual malice as to state of mind, as to defamatory meaning. And those are two-fold. First, what the Virgin Islands Supreme Court did was it essentially adopted Ms. Blackburn's own self-serving testimony about what she meant when she said, I mean, what the Virgin Islands Supreme Court did was it said, Judge Kendall failed to ask her what she actually meant at trial. And in fact, and I think the use of that word is very revealing here. In fact, what she testified to is Mr. Castillo had a- You're talking, all right, we're now focusing on the Castillo articles. I am, Your Honor. All right. I apologize for the confusion. All right. What credibility determinations, in your view, did the jury have to have made relative to the Castillo bail articles? Two important ones, at least, as to defamatory meaning. First, it necessarily rejected Ms. Blackburn's own description of what she said she meant. She said she meant and. He had a history of violence and- Ms. Kendall did choose to release him. I think they were her words. Exactly. She also testified, she continually evaded the question about why she, about the truth of what she said. When she was confronted with the truth, she kept insisting that her reporting was accurate. Does your entire case come down to her use of the word despite? No, it doesn't, Your Honor. The case law is very clear that intended meaning, in fact, that evidence of intended meaning sufficient to support, by clear and convincing evidence, actual malice, can lie also in the juxtaposition of true facts, regardless of the word despite. All right. You've just introduced the term intended meaning, which is critical to the second major issue that I regard as important here, beyond our application of independent review, is what actual substantive standard we are to apply. And because we're talking about defamation by implication, at least as the Castillo articles, we're talking about something different or something beyond mere New York Times versus Sullivan actual malice, are we not? Respectfully, I disagree, Your Honor. I don't think we're talking about defamation by innuendo, because the word that's used here is despite. She said in places, he had a history of violence, full stop. But literally, despite can mean either by implication that he knew about it, or it can mean that he didn't know about it. So literally, despite leaves open those two choices. How can you say then that it's not defamation by implication? Because the word despite carries a great deal of meaning here, and the community, individuals from the community testified to that. The word despite means notwithstanding. It means that something happened. Notwithstanding can still be taken literally, and one can infer that Judge Kendall had no knowledge. It didn't say despite the judge knowing he had a history of violence. It didn't say that. It said despite something, and the something was true. But I'd submit that the most natural meaning of the word despite is that Judge Kendall acted in disregard of something. Maybe, but that's why we're dealing with innuendo, not something that is defamatory on its face. Even accepting. And that's why it's important, I think, that even if you simply address our question for argument purposes only, we may be called upon, if we disagree with you, to apply New York Times versus Sullivan in a defamation by implication context where, as far as I've been able to tell, we've not done that before. So what test should we apply? So I'm glad you asked that. The test that you should apply, in fact, there isn't that much disagreement between the parties, as it turns out. The authorities that have actually addressed this issue are almost uniformly in agreement that the test is- You don't see a circuit split at all in some of the language relative to defamatory meaning or knowledge of defamatory meaning? What I see is that the cases that have studied the issue in more depth tend to agree that the- And in fact, I think the Daily News puts it well in its own brief, saying that there really just, for litigation purposes, isn't much substantive difference between intending to convey a meaning and intending to speak, knowing that a meaning is naturally conveyed and that for evidentiary purposes, they ultimately are the same standard. And that's why I- I appreciate that point, and I'll be interested to hear from your adversary on that matter. So you are saying that you don't see a circuit split, that you don't see a substantive difference between a test that says the defendants intended the defamatory meaning or knew of it, as I think the Seventh Circuit has articulated in the Saines case, or intent alone, which is how I read the Newton case in the Ninth Circuit. I think the difference lies more in the nature of the evidence presented. I think that the intent standard, as Newton has articulated it, would in fact be satisfied with evidence, as the Daily News itself points out, with evidence that the defendant actually knew about the defamatory meaning and proceeded to publish anyway in disregard of it. And I think a nice example of that is an Eastern District of Pennsylvania case, Sprague v. Sprague, where the court asked was there actual malice, was there clear and convincing evidence of intent to publish a defamatory meaning. It was a word that had simply two meanings, and the evidence that the court considered was that the defendant looked up the meaning in the dictionary and saw that there were actually two meanings, and one of them was defamatory, before he called the plaintiff a- But we don't have anything close to that here, right? Yes, we do. We have a very unusual set of facts where we don't have to actually reconstruct what she thought before she uttered the statement, because we know that she heard exactly what the statement meant and then proceeded to utter it. She published it first on April 14, 2007. She then covered the protests. She re-quoted a particular protester who said, with Mr. Castillo, the red flags were huge. But interestingly, am I remembering correctly that after she covered the protests, she did not, in a subsequent article, use the despite language? Respectfully, Your Honor, she did. She used it twice again. Again, she covered the protests immediately on April 16 and used it again in that very article, and then again in a sidebar recap of Judge Kendall's career on April 24. So what we see is a clear use of the meaning with actual knowledge of how the community was interpreting it. And to your point about independent review, Your Honor, I would also note that the question of how the community interpreted a statement, whether defamatory or not, is a classic question of fact, as reaffirmed by this Court a number of times. It's a question of fact in which I'd submit there also should be deference to the jury's finding that the community did, in fact, interpret it in a defamatory way. Did the Virgin Islands Supreme Court get the substantive standard right? Did they state it correctly? No, they did not, and they did not apply it correctly. They noted in case law... Did they articulate it? I'm not asking if they applied it correctly. I realize you don't think that they applied the standard correctly, but did they articulate the correct standard? No, they articulated it as intended to apply when it should have been intended or aware of. Did they correctly engage in the kind of independent review that earlier in this Q&A we discussed, that is, looking to what the jury must have rejected? No, they did not, for two reasons. First, they incorrectly adopted her own statement of what she intended as if that were dispositive. And second, they didn't conduct an independent review of the whole record as they were required to do, and they ignored the ample circumstantial evidence that she, in fact, was fully aware of the defamatory meaning, understood what she was conveying, and yet proceeded repeatedly on at least two more occasions to publish the same defamatory statement. Aren't we really only talking about the Castillo articles as being defamatory here? As I recall, the defendants argue in their brief that you concede that Williams was unsupervised at the time of the standoff. They said that at page 44 of their brief. That's correct. So is there anything left? No, that doesn't begin to resolve the issue, because that's not what Ms. Lutzer reported. Why not? That was the – here we're not talking about defamation by implication. I mean, that was the flat-out statement in that article, was it not? No, I disagree. The statement was about what Judge Kendall had ruled three days earlier. I mean, the gist of it, the gist of the entire reporting, was that Judge Kendall was sending dangerous criminals out into the community to wreak havoc, and there was witness testimony that that was the sting of the Williams statement. So you sued for the gist of the article rather than what the article actually said? As we're correctly entitled to do, that defamation lies in the defamatory sting of the article, irrespective of what the literal words may say. Obviously, the literal words are important, but the issue is the defamatory sting. So reporters today should be concerned that when they write articles that are true that invoke the ire of the public, they're going to be sued for defamation because of the sting of the article. Their cases are legion, Your Honor. I give you a very nice example where the Court found actual malice, where the Court affirmed a summary judgment on – I'm sorry, the Court said there was sufficient evidence of actual malice, where the statement was, even though there's no evidence that financial problems affected the doctor's practice, comma, patient after patient says that there's – the doctor sold them a promise he couldn't keep. And the Court had no problem saying that there was a defamatory meaning that was exactly the opposite of what the statement said on its face, and that the juxtaposition of those two clauses alone was sufficient evidence by clear and convincing evidence that a defamatory meaning was intended, hence actual malice. And it sent the case to the jury on that basis. What about the retirement article? Wasn't that literally true, that is, that the matter remained pending? No, it was literally false, Your Honor. How? The commission had been disbanded, effective in January 2008. There was an appeal pending, was there not? But it was an appeal from a final judgment. In other words, the case – And I'm sure that was of enormous significance to the reading public. I'm sure they were all able to make that very fine distinction. The practical effect is that the cases couldn't have been pending. There was nothing for Judge Kendall to defend. There was no proceeding. The case was over. The appellant might have prevailed, and the disciplinary apparatus might have been reinstated, right? It might have been. Why is that not pending? Because the implication was that two years later, there were still these cases pending against Judge Kendall as if there were still live complaints. But in fact, there weren't live complaints because there was nothing to defend. The cases were not literally pending as it was a final judgment that had entered. Well, we'll have you back on rebuttal, Ms. Green. Thank you very much. Thank you very much, Your Honor. I'll ask Mr. Sullivan to come forward, please. Good morning. Good morning, Mr. Sullivan. Could we begin as we began with Ms. Green, and that is with respect to just what independent review requires of us and of any appellate court? Judge Kendall got a jury verdict. It was taken away from him. Do you agree that the jury's credibility determinations must be deferred to under independent review? And if so, what? Factual determinations of the jury. Sure, Your Honor. I do agree that some deference is due to the jury findings on issues of credibility. I think that much is clear. The point of independent review, though, Your Honors, is that this court has a special role in this process. What plaintiff has posited is what is similar to what's done in normal civil cases, and that is that the rule that you're familiar with is that courts may not weigh the evidence or substitute its version of the facts for the jury's version. No, but your adversary clearly agreed that this is not the same standard by which in a deferential way we review jury verdicts. That is true, Your Honor, and if you look at the words that come out of their mouths, that is indeed what they say. But what they ask this court to do is something that is very much akin to what your kind of standard sufficiency of the evidence kind of review is. And the whole point of independent review in a First Amendment context is that it is fundamentally different. Well, one of our colleagues, a panel of the First Circuit, has said that independent review is not a limitless ransacking of the record as a whole, and I assume you would agree with that. So what... I would indeed. What is it that we're called upon to do? And a follow-up question to that would be, did the Supreme Court of the Virgin Islands take that approach? They did, Your Honor. Here's what you're called on to do. I think the clearest guidance that one can find on this whole process, and it is admittedly murky, but it's you look at what the Supreme Court did in the Hart-Hanks v. Connaughton case. In there, the court said, look, we have to examine the factual record in full. We have to roll up our sleeves and go through that record. And you see that the court did, in fact, do that. It did a... The Supreme Court? Yes, sir. The B.I. Supreme... No, no, I'm sorry. Our United States Supreme Court. All right. And what the court did there, it said, look, we look, we try to discern what testimony the jury must have rejected, and we consider that alongside the undisputed evidence in the record. Where did the Virgin Islands Supreme Court invoke that testimony the jury must have rejected language from Hart-Hanks? I don't see it invoked in terms of what they wrote, if you know what I mean. But I think that is the analysis that they employed for this reason. What this case is, you can talk a lot about these credibility determinations and all of that, but at the end of the day, Your Honor, this case is not a close case. Well, I'm not asking you whether it's a close case, but I'm interested analytically in the path that the Virgin Islands Supreme Court took and the path that we might take. And we agree that it's independent review, and we agree that independent review is not the same as the garden variety form of deferential review that we would ordinarily use. So assuming that the Supreme Court of the Virgin Islands did not certainly explicitly use the what the jury must have rejected approach, we're still employing our own standard of independent review, right? Correct. Which means that we must look to those factual determinations that were made as credibility determinations by the jury and then determine what the jury must have rejected. So what should we look at here in the record? This is what I'm, this is what I'm, I seek to help the court by suggesting this. Where you can make your job easy is the second half of the Hart-Hanks analysis in this case. That is what I'm telling Your Honors. Look at the undisputed record, okay? This is not, Your Honor, a he said, she said kind of case. Most of this was undisputed. You didn't have Joy Blackburn testifying, listen, I talked to Judge Kendall and he said X. Where she said, listen, I talked to Judge Kendall and he said X, Judge Kendall said I said X. Well, you can't dispute what appears in print and what both sides have agreed appears in print. And would you agree that this is a defamation by implication case as to the Castillo article? Absolutely. Absolutely. Because Ms. Green does not agree with that. As such, isn't the meaning that one would was aware of this prior record and nonetheless released Mr. Castillo? I think not. I, in fact, Your Honor, I would say that I don't think that's the reasonable meaning. I would also note for you that the trial Is it a reasonable meaning? Is it a reasonable meaning? I don't think it is. Well then how can this be a defamation by implication case if it isn't? Because well, here's one thing. The trial judge who heard all of the testimony and sat there throughout the trial, at the end of which he ruled it was not a reasonable meaning as a matter of law. And we're sitting here wrestling with whether Ms. Blackburn should have foreseen a meeting that the trial judge ruled as unreasonable as a matter of law. This wasn't a reasonable meaning, Your Honor. And she did not have, whether you make the standard awareness, she did not have the conscious sense of the meaning that the plaintiff argues here. And let me share with you So, are you saying, is that another way of saying she didn't intend the defamatory meaning? Well, it is, Your Honor, but let's go to one of the Well, let's address what the substantive standard here is, which I also inquired of Ms. Green about. Once we're past this threshold independent review notion, I mean, what is the actual malice test here if this is a defamation by implication case? Right. You have to have some evidence that the defendant intended, or if you want the other formulation, the alternate formulation, was intended or was aware of this implication. Because if you don't, you can't make out the actual malice there. And what the courts do, if you look at these cases carefully, courts, they articulate various phrasings of the test. Yeah, I haven't looked at them quite carefully, and I'm not sure I understand them, or let's put it another way, I'm not sure I can synthesize them. I read them in certain ways and think there may be a circuit split, and in other ways, and think that maybe this language can be harmonized. What's your position? I would say that it can be harmonized, Your Honor. That it can? Yes, sir. And I would tell you why. If you look at cases that are kind of at the forefront of the intend or aware formulation, take, for example, the Seventh Circuit in Sains. When the court is actually rolled up its sleeves and it's going through this, the court itself uses an intent formulation. It says we're trying to discern whether the defendant intended to communicate that this fellow was involved in torturing those prisoners, right? The courts use that interchangeably, and for good reason, Your Honor. When you get down into the nitty-gritty of this and start to do this, the difference between knowing, between intending a meaning and publishing it, and speaking, while in some sense knowing that that meaning could be conveyed, is so fine, I don't think that a court of law can slice the salami that thin, and that when you do, that it makes any difference at the end of the day. Is the New York Times v. Sullivan test sufficient to deal with this, or must it be expanded in some way to address the defamation by implication theory? I would say to you, Judge, that it is sufficient, but this is another element of the analysis when you have a defamation by implication context. You have to do an additional bit of work to see that a defendant is not penalized for publishing a statement, admittedly an inmate, but not aware, because that would defeat the whole purpose of actual malice and the protections that were granted by the Supreme Court. Why couldn't it be inferred in this case by the jury that the reporter intended the reader to believe that Judge Kendo released Castillo despite knowing Castillo's criminal past, and also inferred, the jury could have inferred, that it would have been reasonable to expect the judge to have known about the man's background before he made a decision whether or not to release him. But why isn't all of that just a reasonable inference to draw from what the jury did here? Well, two things. One is, if it's an inference, then you are fully capable, going back to what we talked about on independent review, to reassess that for yourself and draw your own inference on that score. The other thing is, what evidence is there that Ms. Blackburn intended or was aware of that inference that you're saying the jury drew? Well, I think their answer is that she wrote it two other times after she had already seen how the community responded to the first article. And they have given you an incorrect chronology, which is critical to both the proper decision in this case and your understanding of that proper evidence. Well, but she was not present during the proceeding where Mr. Steele was released, correct? She was not. But she did go back and do some after-the-fact work, if I recall, checking records. She did. And she would have seen, or did see, the prior record document that was before Judge Kendall at the time he made his bail determination, right? She saw the memorandum record of proceedings that reflected his bail decision. Right. Your Honor, here's the chronology, and this is critical. So, even if she didn't know, could she have been reckless not to have pursued the matter more carefully, more extensively? Your Honor, she, no, she clearly was not reckless. She wasn't writing about Judge Kendall. Where this case has gotten twisted and gone herring off into the weeds is this. Joy Blackburn, Judge Kendall releases Mr. Castillo on this domestic violence charge. One month later, that man kills a little girl, which in this community is a big thing. I would say it's a big thing anywhere. Absolutely. I'm still not sure what that says, however, about the care that the reporter took in researching the matter at or after the time of the bail determination. Your Honor, what she does is she comes to the advice of rights hearing before Judge Holler in April after the death of this little girl. And what she's reporting on is this tragic murder. So, she goes, she sees this man. She hears what's said in open court before Judge Holler. She talks about this fellow's history of violence. Ms. Blackburn faithfully goes and looks at all his criminal records. She knows as sure as she stands that this man indeed had a history of violence. One of the things she does is look at his priors. And she sees that a month prior, he was before Judge Kendall, and Judge Kendall released him on recognizance. Pardon me. I'm sorry. When she reports to the community, she's reporting the fact that Judge Kendall let this fellow out. That's why he's out. In terms of what was before Judge Kendall and all of that, that wasn't her mindset at the time at all. She wasn't focused on that. She was trying to explain to people that he's out on the street because he was released on recognizance. And she knew to a moral certainty exactly what this fellow's criminal history was. It's interesting, though, and I read the article. He was out on recognizance. Nothing is said in the articles that I looked at about the fact that the prosecution was perfectly satisfied to let him out on a $500 ROR. But Judge Kendall's the focus of the stories. He really is not the focus of the stories, Your Honor. He is not. Did the article mention that the prosecutor didn't ask to have this dangerous person held pending trial? That's what I'm saying, Your Honor. She wasn't down into the nuts and bolts of what went on before Judge Kendall. I'm not sure if that's a yes or a no. My question was, did the article mention that the prosecutor did not ask that this dangerous accused be held pending trial? No, sir. Then how can you disagree with Judge Smith's statement that Judge Kendall was the focus of the article when there was nary a mention of the prosecutor? What the focus of the article was, was that Castillo, this man who had this very long and sad history, killed this little girl. That was the focus of the article. The focus of the article was on the hearing that took place before Judge Holler in April. Okay? It was not on, it wasn't down into the nitty gritty of what went on before Judge Kendall a month prior. And this is the critical part I told you earlier that responds to part of the core of the plaintiff's case. You need to understand the chronology, because if you don't, you're going to go off the road. And that is this. The chronology of this simply does not work for the plaintiff. Ms. Blackburn first reported that Castillo was released despite a history of violence on April the 14th. That's immediately after the Judge Holler advisory. Ms. Blackburn then speaks to Judge Kendall the next day on April the 15th. And Judge Kendall does not say, he doesn't say to her, hey... I remember reading that. I don't know what difference that makes, the fact that he doesn't raise anything. I'll tell you why, Your Honor. What's the import of that here? As to whether or not she had actual malice. I'll tell you precisely the import. He says, and then they've argued throughout this case, well, Joy Blackburn didn't talk to anybody who was at the Advice of Rights hearing before Judge Kendall. You'll recall that. Didn't call the prosecutor, didn't call the defense lawyer, didn't get the transcript. Didn't talk to anyone who was there. Well, guess what? That is not correct. She talked to Judge Kendall. She went to the horse's mouth. Well, that doesn't help you for the April 14th article. It might help you for the ones that came after. Precisely. But follow this, Your Honor. So she talks to him on the 15th. She repeats, she doesn't have this state of mind, this knowledge, right? She publishes on the 16th the exact same phraseology. That Castillo was released despite his history of violence. The protests that they keep talking about, there's a little sleight of hand here. The protests don't take place until the 23rd of April. And the other report doesn't take place until the 24th. So Ms. Blackburn cannot have this state of mind, this knowledge, provided by the reaction of the protesters. She's published it twice with no protests taking place. Let me ask you quickly, if I may, Mr. Sullivan, with respect to the Williams articles. Yes, sir. Do I recall that the Supreme Court of the Virgin Islands addressed that issue as being one of literal truth? That, in fact, Mr. Williams was released unsupervised, and therefore there was no defamatory meaning? Among other things. You really have to scratch your head and wonder the area of dispute on that one. Judge Kendall himself concedes that when he went there the day of the standoff, that this man was unsupervised. The fact that we're this far along in the process, years and years fighting over the difference between his claim that he released this fellow on house arrest and that he released him unsupervised into the community, I mean, the distinction there is a fine one indeed. And with respect to the retirement article and the pending language, that is also the manner in which the V.I. Supreme Court addressed the issue, that is, that literally they were true, that was true? Essentially, Your Honor. The thing there is, on that retirement article, the very claim that they're complaining about, if a person reads the article, you'll see the full explanation. And the notion that you can be defamed by a sub-headline, I mean, you cannot sell that to anybody in modern defamation law, if you know what I mean. That just doesn't hold water. All right. Thank you very much, Mr. Sullivan. We'll have Ms. Green back for rebuttal. Ms. Green, if you assume for a minute that we view this as a defamation by innuendo or implication case, what cases from either the Supreme Court or the United States Courts of Appeals can you cite for us where those appellate courts have upheld jury verdicts finding defamation by innuendo or implication? Your Honor, I'd have to go back and think about the procedural posture of the case. But there's no question that there's a well- Well, the question was about a procedural posture, actually, and that is what you've already got a jury verdict, right? I have to confess, I'd have to- I don't want to hide my cards here. I'll show them to you. The reason I ask the question is it seems to be a fairly unprecedented thing. If I remember correctly, it may have been one- Hart-Hanks may help you in that regard, if I remember correctly. But I'm at a loss to think of any other case from the Supreme Court or any Court of Appeals that has ratified, upheld, if you will, this type of verdict in a case. I'd point you to the Eastwood v. National Enquirer case out of the Ninth Circuit, which, I have to confess, I don't remember if it was after a jury verdict. It may have been a summary judgment case. I have to tell you, these cases are very rare. It's very rare that they reach the circuit courts. Why are they so rare? It's actually very rare that they even reach the circuit courts. There are very few defamation cases at all in this circuit. There's really only a handful. The posture of each case- One of them against the Virgin Islands Daily News, one of our three cases, I believe. And that's a case very similar to this, in which a reporter fabricated- I'm sorry, not a reporter, but the editor- fabricated a statement that didn't appear, that the source never gave her. A case very similar to the evidence in this case. The answer is, there aren't that many cases that address this issue. But the Eastwood case, I think, is instructive. Because it was a case where, like this, the National Enquirer had a blaring sort of headline, front-page statement, exclusive interview with Clint Eastwood. And the question was, does that convey that Clint Eastwood actually gave an interview to the National Enquirer, demeaning him in the eyes of his fans? And the court had no trouble saying that that could constitute actual malice by clear and convincing evidence. And because there was evidence that the editors had actually considered the defamatory implications, aware of the defamatory implications before they published, and they went ahead and published anyway. And Judge Kosinski had no trouble recognizing that, applying the Bose standard of review. He was particularly mindful of Bose's comment about the deference to jury findings, as I recall. But if it is so rare, though, that just seems to, at the level of generality, or the global level, the rarity of this type of case seems to run smack into your argument that it suffices to write something that could be deemed ambiguous or could be taken a couple different ways. And as long as the community reacts a certain way, then bingo, you've got sufficient evidence of defamation by innuendo. In return, do I understand your position to be that this is not a defamation by innuendo or defamation by implication case, as you suggested earlier? No, I'm willing to assume by innuendo that it is a defamation by implication to address it. I think the rarity speaks only to the rarity of cases against public officials that make it to the appellate court level. There just aren't that many. It is a high standard. I recognize that. Judge Smith, I would also like to supply an answer to your question that you raised about whether Ms. Blackburn was reckless in reporting the way she did. And I wanted to just sketch out for you the evidence there. Because she was reckless, and the jury was entitled to find that, and I think this court should be convinced of that as well as it reviews the evidence. So first of all... Was there a general verdict here, or were there special interrogatories? General verdict. That's what I thought. So any one statement alone would be sufficient to support the jury verdict. So first of all, her chief defense at trial was that her statement was accurate because she reported what was in the court record. But the evidence on what the court record shows was clear. There was only one single court record that showed what happened at that March 2nd bail hearing before Judge Kendall, the only hearing that Judge Kendall conducted relating to Mr. Castillo. And she admitted at trial that that memorandum record did not show that he released him despite a history of violence. But there's more than that. She actually held in her hands, and she admitted this also at trial, that she looked at the rap sheet that was before Judge Kendall, the March 2nd version of the rap sheet, which also showed no history of violence. It said there was a property charge, a property conviction, and then there was a rape charge that said no known disposition. That alone gave her substantial reason to doubt that there was any information about a history of violence before Judge Kendall. But there's more. She also knew, from looking at the memorandum record of proceedings, that Judge Kendall has made his decision based on representations that had been made to him during that proceeding. And she knew she didn't have those representations, and she didn't know what that information was. There's more than that. All right. You are... If you have a question. When did she meet with him after... How soon after the April 14th article did she meet with him? She called him up on a Sunday. They had a conversation. There's evidence in the record about that conversation, but I contest... A Sunday is when? Was that the next day? I'm sorry, the next day. Okay, so in that conversation, he quite spiritedly told her that he had no idea that this fellow had a history of violence. Is that what the record shows? I agree. He didn't tell her that. He didn't tell her that? No. He did not say that at that point. So we should affirm a large verdict against her for things she wrote after he didn't even feel the need to tell her that he was unaware of this fellow's history of violence? It's a piece of evidence in the case, but remember, what Judge Kendall testified to was that he'd now been the victim of these attacks. The Daily News had been attacking him, putting large pictures of him next to every defendant he released for years. He had given an interview to her in chambers years ago in which he'd explained to her that he had to consider the particularized circumstances presented to him in court. And the particularized circumstances would have included Castillo's entire criminal history? Should have, but in this case didn't. There's no dispute that it didn't include that. So she was aware from prior interviews that he had to consider all the facts and circumstances and make an individualized determination in every case, correct? Correct. So that would include the rap sheet of every defendant who came before him before he made a decision on bail? Absolutely, and the rap sheet that she looked at, that she knew, showed no history of violence. If there are no more questions? Thank you very much. And we thank both of counsel. The case was well-briefed, well-argued. We will take the matter under advisement. Thank you very much.